UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN PATRICK HUGHES, Petitioner, | ) ) ) **04 10773 REK** |
| v. | ) ) CIVIL NO. |
| DAVID WINN, Warden, FMC Devens, DAVID DWYER, Community Corrections Manager, U.S. Bureau of Prisons and JOHN ASHCROFT, Attorney General of the United States, Respondents. | ) ) MAGISTRATE JUDGE Cohen ) ) ) ) ) ) ) ) |

PETITION FOR WRIT OF HABEAS CORPUS
AND/OR FOR WRIT OF MANDAMUS

Petitioner, John Patrick Hughes, an inmate at the Devens Federal Medical Center, respectfully petitions this court for a writ of habeas corpus, pursuant to 28 U.S.C. § 2241, and/or for a writ of mandamus under 28 U.S.C. § 1361, directing the Warden of the Federal Medical Center and the Bureau of Prisons to reconsider his eligibility for a prompt transfer to community confinement, using the policies in existence before December 16, 2002. Petitioner also seeks declaratory relief under 28 U.S.C. § 2201.

Petitioner submits that the Warden's decision delaying his transfer to a halfway house until he has served 90% of his sentence is based solely on a new policy, ordered by the Attorney General on December 16, 2002, and founded on an incorrect statutory interpretation. That opinion effectively changed the

existing Bureau of Prisons policy, which had permitted a prisoner to spend up to six months in a halfway house, regardless of the length of the sentence imposed. The new policy, limiting halfway house portions to ten percent of the total sentence, was enacted in violation of the Administrative Procedures Act, and, as applied to Mr. Hughes, whose offense of conviction occurred more than three years before the policy change, violated the Ex Post Facto Clause of the Constitution.

Because fewer than six months remain to be served on Mr. Hughes' term of imprisonment, prompt action on this petition is requested.

In support of this petition, Mr. Hughes states the following:

1.  Mr. Hughes was charged by indictment number 99-10405-REK and convicted by a jury on June 27, 2002.

2.  On February 20, 2003, this Court sentenced Mr. Hughes, as a result of a downward departure, to a sentence of 18 months' imprisonment. The Court recommended that Mr. Hughes serve the sentence at FMC Devens; the Bureau of Prisons honored that recommendation. Mr. Hughes was allowed to self-surrender.

3.  Six days after Mr. Hughes was sentenced, his wife gave birth to their first child.

4.  On April 8, 2003, when his daughter was six weeks old, Mr. Hughes reported to FMC Devens to commence service

of his sentence. Mr. Hughes' incarceration has resulted in great economic hardship for his wife and child.

5.   After Mr. Hughes was convicted, but before he was sentenced, the Department of Justice ("DOJ") issued a memorandum directing the Bureau of Prisons ("BOP"), inter alia, to abandon its long-standing policy of transferring defendants to "community corrections centers" ("CCCs"), also known as halfway houses, when they were within six months of completing their sentences. See DOJ letter to Kathleen Hawk, dated December 16, 2002, attached hereto as Exhibit A. The former CCC policy was incorporated in the Bureau of Prisons program statement. See BOP Program Statement 7310.04 (pertinent portion attached hereto as Exhibit B).[1] That policy states that an inmate may be transferred to a halfway house for up to 180 days of the final portion of his or her sentence, and in extraordinary cases for a longer period, even if that period exceeds 10 percent of the total sentence. See id., ¶ 5, at 3-4 (1998).

6.   In its December 16, 2002 memorandum, the Department of Justice told BOP that transfers to halfway houses could not exceed ten percent of the sentence imposed, even if that period was less than six months. See DOJ memo, at 2. This was a complete, substantive change from BOP's existing policy as set forth in its program statement.

---

[1] Defendant notes that this policy still appears on the BOP's website. See www.bop.gov.

7. Mr. Hughes has been approved for a transfer to a halfway house, but, as a result of the new policy, that transfer will not occur until June 8. The deprivation of several months of additional time to obtain employment, support his family, and begin his transition back into the community will irreparably harm both Mr. Hughes and his family.

8. As set forth below, the DOJ policy

a) erroneously interprets the applicable statutes;

b) violates the Administrative Procedures Act and therefore is invalid; and

c) violates the Ex Post Facto clause of the Constitution.

Several courts have adopted some or all of these contentions with respect to the new policy regarding so-called "back-end" transfers from prisons to halfway houses. See, e.g., Cato v. Menifee, 2003 U.S. Dist. LEXIS 21289 (S.D.N.Y. Nov. 25, 2003) (granting writ of habeas corpus requiring consideration of earlier release to halfway house, under policy in place before December, 2002); Zucker v. Menifee, 2004 U.S. Dist. LEXIS 724 (S.D.N.Y. Jan. 21, 2004)(granting writ of mandamus to same effect); Monahan v. Winn, 276 F.Supp.2d 196 (D. Mass 2003) (Gertner, J.). But see Kennedy v. Winn, No. 03-CV-10568 (D. Mass. 2003) (Lasker, J.) (denying pro se habeas petition challenging "back-end" policy change); Rothberg v. Winn, 03-CV-11308-RGS (D. Mass. 2003) (Stearns, J.) (same); United States v. Mikutowicz, No. 01-CR-10321-RWZ (Zobel, J.) (same). The issue is

pending before the Court of Appeals for the First Circuit in Goldings v. Winn, No. 03-2633, an appeal from the denial of a habeas petition by Judge Young.  See Goldings v. Winn, No. 03-CV-40161-WGY (D. Mass. 2003).  Argument is scheduled for May.

9.   Mr. Hughes submits that he need not pursue administrative remedies, since the current BOP policy renders such administrative appeals futile and because he faces imminent irreparable harm.  Monahan, 276 F.Supp.2d at 204-05(D. Mass. 2003)(Gertner, J.) (holding that there is no statutory exhaustion requirement applicable to a habeas petition brought under 28 U.S.C. § 2241, distinguishing 18 U.S.C. § 3626(g)(2)); Iacaboni v. United States, 251 F.Supp.2d 1015, 1017 n.1 (D. Mass. 2003) (Ponsor, J.); Howard v. Ashcroft, 248 F.Supp.2d 518, 533 (M.D.La. 2003)("Where an agency has adopted a new rule or policy and announced that it will follow that policy, especially where that policy has its origin above the Bureau's General Counsel Office, it is pointless to require a complainant to follow the administrative procedure").

ARGUMENT

I.   THE DEPARTMENT OF JUSTICE'S NEW POLICY RELIES UPON AN ERRONEOUS LEGAL INTERPRETATION.

The DOJ's directive to BOP focused primarily on its claim that BOP lacked the authority to designate an inmate directly to a halfway house for service of an entire term of imprisonment.  A scant paragraph also announced that 18 U.S.C. § 3624(c) limits

"back-end" transfers to halfway houses to no more than the last 10% of the sentence. This statement is based on a distorted partial quotation from that statutory provision, which reads:

> The Bureau of Prisons shall, to the extent practicable, assure that a prisoner serving a term of imprisonment spends a reasonable part, not to exceed six months, of the last 10 per centum of the term to be served <u>under conditions that will afford the prisoner a reasonable opportunity to adjust to and prepare for the prisoner's re-entry into the community</u>. The authority provided by this sub-section may be used to place a prisoner in home confinement.

18 U.S.C. § 3624(c) (emphasis added). As Judge Gertner pointed out in <u>Monahan</u>, this provision

> places no curbs on BOP discretion as to place of confinement prior to the last six months or 10% of confinement. The provision's purpose is not to set strict conditions on when the BOP can designate a prisoner to community confinement.

<u>Monahan</u>, 276 F.Supp. at 210.

The directive to BOP was based on a DOJ Office of Legal Counsel ("OLC") memorandum (attached hereto as Exhibit C) that concluded that § 3624(c) prohibited the transfer of prisoners to halfway houses for more than 10 per cent of their sentences. But the OLC interpretation failed to acknowledge that § 3624(c) does not mention halfway houses, and that it is phrased as an encouragement, not a limitation. As the district court held in <u>Howard</u>,

> As the court reads this subsection, Congress is directing the Bureau to do its level best to assure that everyone who has served time get a decent opportunity to go through a period of readjustment before being thrust back into the community. Yet the

> Government would have the court read this section as a stiff curb on the Bureau's ability to make such placements at all. The court finds this reading to be implausible.

Howard, 248 F.Supp.2d at 544.

The OLC opinion's overly restrictive reading of § 3624(c) rests on the erroneous assumption that BOP lacks the legal authority to designate a halfway house as a place of imprisonment. As numerous courts have held, this is based on a distorted reading of 18 U.S.C. § 3621(b).[2] That statute reads as follows:

> The Bureau of Prisons shall designate any available penal or correctional facility that meets minimum standards of health and habitability established by the Bureau, whether maintained by the Federal Government or otherwise and whether within or without the judicial district in which the person was convicted, that the Bureau determines to be appropriate and suitable, considering -
>
> (1) the resources of the facility contemplated;
>
> (2) the nature and circumstances of the offense;
>
> (3) the history and characteristics of the prisoner;
>
> (4) any statement by the court that imposed the sentence -
>
>> (A) concerning the purposes for which the sentence to imprisonment was determined to be warranted; or

---

[2] In this district, two judges have held that the OLC opinion's statutory interpretation is incorrect. See, e.g., Monahan v. Winn, 276 F.Supp. 2d 196, 205-08 (D. Mass 2003)(Gertner, J.); Iacaboni v. United States, 251 F.Supp.2d 1015, 1024-34 (D.Mass. 2003) (Ponsor, J.).

>    (B) recommending a type of <u>penal or correctional facility</u> as appropriate; and
>
>    (5) any pertinent policy statement issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28.

18 U.S.C. § 3621(b) (emphasis added). The statute further states, "The Bureau may at any time, <u>having regard for the same matters</u>, direct the transfer of a prisoner from one penal or correctional facility to another." <u>Id</u>. (emphasis added).

The phrases "<u>penal or correctional facility</u>" are not defined by statute. While the DOJ memorandum purports to "assume <u>arguendo</u>" that a community corrections center could be a "penal or correctional facility" within the meaning of § 3621(b), Memorandum at 7 n.8, its conclusion depends upon the opposite assumption.

The memorandum states that "residents of a community corrections center, or halfway house, although still in federal custody, are generally not confined to the facility throughout the day but are instead able to pursue outside employment, training, and education." Memorandum at 7. DOJ concludes that the ability to pursue such activities makes the halfway house unsuitable as a "place of . . . imprisonment." <u>Id</u>.

This assertion is contradicted by the clear Congressional directive, set forth in 18 U.S.C. §§ 3622(b) and (c), permitting the BOP to "release a prisoner from the place of his imprisonment for a limited period . . . to . . . (b) participate in a

-8-

training or educational program in the community while continuing in official detention at the prison facility" or to "(c) work at paid employment in the community while continuing in official detention at the penal or correctional facility[.]" The statute authorizing prisoners to work at "paid employment in the community" (an option that, according to BOP officials is <u>only</u> available to federal inmates at CCC's) contradicts DOJ's claim that one imprisoned in a penal or correctional facility <u>by definition</u> cannot work in the community.

The DOJ memorandum asserts, without meaningful argument, that § 3622(c) does not authorize service of a sentence at a halfway house because it includes the requirement that the inmate continue in official detention. Memorandum at 8. Again, the assertion depends upon an unfounded premise: that a halfway house is neither a "correctional facility" nor "official detention."

The Supreme Court has recognized that BOP inmates placed in CCC's are in "official detention," as used in the pertinent sentencing statutes. <u>Reno v. Koray</u>, 515 U.S. 50 (1995) (holding that a defendant released under the Bail Reform Act on the condition that he reside in a halfway house was not entitled to jail credit as he was not in "official detention"). The Court read "official detention facility," as used in 18 U.S.C. § 3585(a) (the jail credit statute) to "refer to a correctional facility designated by the Bureau for the service of federal

sentences, where the Bureau retains the discretion to 'direct the transfer of a prisoner from one penal or correctional facility to another.' § 3621(b)." Id. at 58. The Court found support for this reading in §§ 3622(b) and (c).

Furthermore, relying upon BOP's own program statement defining "official detention," the Court noted significant differences between defendants sent to a CCC as a condition of release and those placed there by BOP, the main one being that "defendants who are 'detained' or 'sentenced' <u>always remain subject to the control of the Bureau</u>." Koray, 515 at 63 (emphasis in original).

II. THE BOP'S ACTION VIOLATES ITS OWN POLICIES AND IS IN VIOLATION OF THE ADMINISTRATIVE PROCEDURES ACT.

Program Statement 7310.04 permits transfers to CCC's of inmates who have more than six months remaining to serve. It explicitly states that "the Bureau is not restricted by § 3624(c) in designating a CCC for an inmate and may place an inmate in a CCC for more than the 'last ten per centum of the term,' or more than six months, if appropriate." More than a year after the policy change, this statement remains available on the BOP website, www.bop.gov. On information and belief, BOP has not issued a change notice rescinding or amending these program statements. Instead, the BOP website contains a document entitled "Memorandum for Chief Executive Officers," dated

December 20, 2002. It includes, in pertinent part, the following statement:

> Effective immediately, the Bureau's CCC designation authority is defined as follows:
>
> . . .
>
> (2) Pre-release programming CCC designations are limited in duration to the last 10% of the prison sentence, not to exceed six months. This limitation, and the following two exceptions, apply to all U.S. Code and D.C. Code offenders whose prison sentences are administered by the Bureau:
>
> - Inmates completing the Residential Drug Abuse Program (RDAP) may exceed the 10% limitation, but are still limited to a maximum six-months prerelease CCC designation; and
>
> - Inmates completing an Intensive Confinement Center (ICC) program may exceed both the 10% and six months limitations, at this time. The OLC opinion's impact on this issue is still being reviewed, and further guidance will be forthcoming.

The memorandum refers to the new policy as a "change" and discusses the implementation of it in mandatory terms.

The absence of any recission or repeal of the pre-existing program statements leaves them in full effect. Cf. Mada-Luna v. Fitzpatrick, 813 F.2d 1006, 1011-12 (9th Cir. 1987) ("The INS's replacement of the original, 1978 version of the Operating Instruction with the 1981 version involves two separate procedural aspects: (1) the repeal of the 1978 Instruction; and (2) the promulgation of the 1981 Instruction.") The new transfer policy is directly contrary to the existing program statement.

Even if the Memorandum for Chief Executive Officers could be construed as notice rescinding or amending the relevant program statements, it violates the requirements of the Administrative Procedures Act, 5 U.S.C. §§ 552, 553. The APA requires, <u>inter alia</u>, that:

> (b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include -
>
> > (1) a statement of the time, place and nature of public rule making proceedings;
> >
> > (2) reference to the legal authority under which the rule is proposed; and
> >
> > (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.

5 U.S.C. § 553(b). The APA further requires that, after notice,

> the agency shall give interested persons, an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation.

5 U.S.C. § 553(c). Finally, the publication must be made at least 30 days before the rule's effective date unless it is "grants or recognizes an exemption or relieves a restriction"; is an "interpretive" rule or "statement[] of policy"; or "as otherwise provided by the agency for good cause found and published with the rule." 5 U.S.C. § 553(d).

While the APA's "notice-and-comment" requirements do not apply to "interpretive rules, general statements of policy, or

rules of agency organization, procedure, or practice," courts have defined an "interpretative rule" as one that "effectuates no change in policy or law and merely explains or clarifies existing law or regulations." Allen v. Bergland, 661 F.2d 1001, 1007 (4th Cir. 1981). Clearly, the new BOP policy regarding CCC placement is a change in existing policy, making unavailable to an entire class of inmates what was available before.

The rationale for requiring notice and comment for policy changes supports the applicability of those requirements to the new BOP policy:

> One of the central purposes of the notice and comment requirements is to allow public participation in the promulgation of rules which have a substantial impact on those regulated. Thus, as a general rule, thirty days notice for solicitation of comments must precede all substantive, or legislative, rules and those interpretive rules which both constitute a change in prior agency position and have a "substantial impact on private rights and obligations."

National Retired Teachers Association v. U.S. Postal Service, 430 F.Supp. 141, 147 (D.D.C. 1977), aff'd, 593 F.2d 1360 (D.C.Cir. 1979). A rule that fails to comply with the APA's publication requirements is invalid. D&W Food Centers v. Block, 786 F.2d 751, 757 (6th Cir. 1986); Buschmann v. Schweiker, 676 F.2d 352, 355-56 (9th Cir. 1982). See also Mada-Luna, 813 F.2d at 1012 (holding that INS repeal of former operating instructions and promulgation of new ones each "independently triggers section 553's notice-and-comment requirements unless it qualified for one of the exceptions contained in that provision").

Because the new policy is a substantive change in BOP policy, with a substantial impact on private rights, its failure to comply with the APA renders it void. "This is no mere effort at interpretive guidance but rather a rulemaking exercise designed to reshape the scope of a statutory provision through an administrative statement of lawmaking." Mallory v. United States, 2003 U.S. Dist. LEXIS 4522, at *4, (Woodlock, J.).[3] Numerous courts have agreed, including two others in this district. See, e.g., Monahan v. Winn, 276 F.Supp. 2d 196, 212-215 (D. Mass 2003) (Gertner, J.); Iacaboni v. United States, 251 F.Supp.2d 1015, 1038-40 (D.Mass. 2003) (Ponsor, J.).

III. THE CHANGE IN BOP POLICY IS AN IMPERMISSIBLE INCREASE IN PUNISHMENT THAT VIOLATES THE EX POST FACTO CLAUSE.

"The presumption against the retroactive application of new laws is an essential thread in the mantle of protection that the law affords the individual citizen." Lynce v. Mathis, 519 U.S. 433, 439 (1997). In order to come within the prohibitions of the Ex Post Facto clause of the Constitution, a law must be retroactive and "it must disadvantage the offender affected by it." Miller v. Florida, 482 U.S. 423, 430, citing Weaver v. Graham, 450 U.S. 24, 29 (1981). Both conditions are met here.

---

[3] Judge Woodlock held the new policy (as it related to a transfer of a halfway house resident back to a prison) to be invalid, without deciding whether the DOJ interpretation of the relevant statutes was erroneous. Mallory, at *5.

"Critical to relief under the Ex Post Facto Clause is not an individual's right to less punishment, but the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated." Weaver v. Graham, 450 U.S. 24, 30 (1981).

In Lynce, the Supreme Court found an ex post facto violation in a retroactive restriction on eligibility for certain early release credits. In doing so, it held, "the 1992 Florida statute did more than simply remove a mechanism that created an opportunity for early release for a class of prisoners whose release was unlikely; rather, it made ineligible for early release a class of prisoners who were previously eligible[.]" Lynce, 519 U.S. at 447. That is precisely what has occurred here.

Judges Gertner and Ponsor have concluded that the change in BOP policy regarding halfway houses violates the Ex Post Facto clause, when applied to inmates whose criminal conduct occurred before the policy change. Monahan, 276 F.Supp. 2d at 218, citing Ashkenazi v. Attorney General, 246 F.Supp.2d 1, 6 (D.D.C. 2003); Iacaboni, 251 F.Supp. at 1040-41. See also United States v. Serpa, 251 F. Supp. 2d 988, 991-993 (D.Mass. 2003)(granting downward departure due to Ex Post Facto issues raised by change in BOP policy regarding initial designations to halfway houses) (Young, J.). This court should reach the same conclusion in this case.

CONCLUSION

For the reasons set forth above, the court should issue a writ of mandamus or habeas ordering the Bureau of Prisons to reconsider Mr. Hughes for immediate release to a halfway house, applying the policies that existed before December 16, 2002. We further ask the court to reserve its habeas power to order Mr. Hughes' immediate release to a halfway house, should BOP fail to act.

JOHN PATRICK HUGHES
By his attorney,

*/s/ Miriam Conrad*

Miriam Conrad
   B.B.O. # 550223
Federal Defender Office
408 Atlantic Ave., 3rd Floor
Boston, MA  02110
Tel: 617-223-8061

CERTIFICATE OF SERVICE

I, Miriam Conrad, hereby certify that a true copy of the above document was served upon Assistant United States Attorney James F. Lang by delivery and upon David Winn, Warden, FMC Devens, and David Dwyer, CCM, Bureau of Prisons, by first-class mail on April 15, 2004.

*/s/ Miriam Conrad*